**COCONUT GROVE EXCHANGE BANK v. COLUMBIA CASUALTY CO.**

No. 11470.

Circuit Court of Appeals, Fifth Circuit.

April 10, 1946.

Leland Hyzer and Inman Padgett, both of Miami, Fla., for appellant.

Dewey Knight, of Miami, Fla., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

Ernest Apostle and Genevieve H. Adams were partners, doing business as the Miami Poultry & Egg Company. Mrs. Adams died but the business was thereafter carried on solely by Apostle. They will be referred to as "Apostle". The business operated several large refrigerated truck-trailers throughout the southeastern part of the United States for the purpose of buying poultry and eggs for resale in Miami. Three of the main customers for the eggs so bought were Wilson & Company, Cudahy Packing Company, and George Ehlenberger & Company, Inc. Since it was necessary for Apostle to pay cash for the poultry and eggs, and since he desired to enlarge the amount and range of the business, he sought additional funds from the Coconut Grove Exchange Bank. An arrangement between Apostle and the Bank was entered into whereby Apostle would, upon procuring an order from either Wilson, Cudahy, or Ehlenberger, assign the invoice or account to the Bank, attach it to a note in favor of the Bank, and thus obtain the funds with which he would buy poultry or eggs. Upon delivery to, and payment by, the ordering customer, Apostle was to repay the loan made by the Bank. As further assurance that the money advanced by the Bank would be used for purchasing poultry products and that the proceeds of sales thereof would be paid over to the Bank, Apostle executed a bond with appellee, Columbia Casualty Company, as surety, which contained the following pertinent provisions:

"Whereas, the Principal intends to purchase from various individuals or concerns their goods, wares or merchandise for resale to Wilson and Company, Cudahy Packing Company and Geo. Ehlenberger & Company, Inc., at Miami, Florida, and,

"Whereas, the Obligee has agreed that it will, from time to time, loan to the Principal monies not to exceed at any one time the total sum of Five Thousand Dollars ($5,000.00) (all applications for loans to be subject to the approval of the Obligee) to enable the Principal to finance the purchase of said goods, wares, or merchandise for re-sale as aforesaid, and

"Whereas, it is the desire of the Obligee so long as any obligation arising by reason of the financing of the Principal by the Obligee remains unpaid, to protect itself from any and all loss that may be sustained through the wrongful conversion amounting to Larceny and Embezzlement by the Principal of said goods, wares or merchandise purchased for re-sale by the Principal or of any monies actually collected by the Principal through the re-sale of said goods, wares or merchandise.

"Now, Therefore, the condition of this obligation is such that if the above bounden Principal shall indemnify the Obligee from and against any and all loss which the Obligee shall sustain through the wrongful conversion amounting to Larceny and Embezzlement by the Principal of any goods, wares, merchandise or money actually collected by the Principal in connection with the purchase and re-sale of any goods, wares or merchandise financed as aforesaid, then this obligation shall be void; otherwise of full force and effect.

\* \* \* \* \* \*

"3. The Surety shall not be liable for any loss that may be sustained by the Obligee on account of any indebtedness of the Principal to the Obligee other than arising from the wrongful conversion of any goods, wares, merchandise or money for which the Principal is required to account as herein provided.

"4. On the 10th of each month a record of the preceding month showing what goods, wares or merchandise has been purchased by the principal for re-sale or what accounts have been collected in connection with all goods, ware, merchandise purchased by the Principal for re-sale, shall be submitted by the Principal to the Obligee, in duplicate, and if found to be correct, the duplicate copy of said record shall be so certified to by the Obligee and promptly mailed to the Surety at its home office."

In actual operation the business between Apostle and the Bank took substantially this course:

1. Ehlenberger, for instance, would write Apostle: "Please purchase for us 250 cases of fresh eggs,"—no price or terms or time of delivery being mentioned.

2. Thereupon Apostle would make out an invoice against Ehlenberger for 250 cases of fresh eggs at the price which he expected to charge to Ehlenberger upon

544

delivery. He would then assign the invoice to the Bank, attach to it a note payable to the Bank in an amount sufficient to buy the eggs to fill the order, and the money so borrowed would then be turned over to the truck driver with directions to go to Tennessee, or elsewhere, to purchase the eggs. It was never required that Ehlenberger accept the invoice before its assignment, nor that Ehlenberger be notified that the Bank held an assignment of the so-called "account". Perhaps the parties thought that such a transaction before the acquisition of the eggs, before the fixing of a price, before delivery, was too incomplete to proffer for acceptance.

3. The eggs were purchased and brought to Miami, and if Ehlenberger accepted and paid for them, the proceeds were deposited in the general checking account of Apostle in the Bank, from which account all payments that were ever made to the Bank were drawn from time to time. All sums borrowed were likewise deposited in this account, and were repaid out of this account, except the last two transactions which were not repaid from any source.

On these last two transactions two so-called orders from Ehlenberger were received and assigned to the Bank, the money was borrowed, and the eggs were bought and brought to Miami, but in the meantime the supply of eggs became greatly in excess of the demand. The Miami market was flooded. The price dropped precipitately. Ehlenberger refused to take the eggs. Apostle was unable to pay the Bank. Creditors, suits, and a surfeit of eggs fell upon him like the earth, the trees, and the rocks in a landslide, crushing his frail financial structure in their advance. This suit by the Bank against the Surety Company resulted, and from a decision adverse to it the Bank appealed.

It is in the testimony that under the course of dealings in Miami a merchant could request the produce dealer to procure for him a quantity of eggs without being bound to accept the eggs when tendered. Such an order, it seems, was regarded more in the nature of information to the poultry dealer as to the estimated requirements of his customer than as a binding contract to buy eggs. In the absence of an agreement as to price to be paid, the date of delivery, the terms, or the quality of eggs, the so-called custom of the trade to consider that such an "order" was not a binding contract would seem to have legal sanction.

It is in evidence that Apostle owed the bank $1,000 which he had borrowed for the purchase of equipment and which was not within the terms of the egg contract, and that the Bank charged this indebtedness to the account of Apostle, thereby also evidencing the fact that it did not consider the account, in which the proceeds from the sale of the eggs had regularly been deposited, as money belonging to it or held in trust for it under the agreement.

It is undisputed that when Ehlenberger declined to accept the eggs Apostle had to dispose of them to other parties and at great loss, and it is also admitted that the proceeds from these eggs were deposited in the Bank to Apostle's credit but were not applied to the payment of any loan, for the payment of which Apostle had pledged the proceeds of those eggs.

The question for decision is whether these last two transactions constitute "wrongful conversion amounting to Larceny and Embezzlement by the Principal of any goods, wares, merchandise or money actually collected by the Principal in connection with the purchase and re-sale of any goods, wares or merchandise financed as aforesaid, * * *," as covered by the bond.

The Court below answered in the negative. We agree because:

1. The so-called orders and the so-called accounts which Apostle assigned to the Bank were insufficient to vest title in the Bank either to the eggs or to the proceeds derived from the sale of the eggs, or to make Apostle the trustee of such proceeds, in the absence of which there could be no conversion or embezzlement within the terms of the bond.

2. The facts in the case failed to show the requisite intent to convert the funds to his own use at the time he obtained possession thereof as is necessary in order to establish larceny on the part of Apostle. See Fitch v. State, 185 So. 435, 135 Fla. 351.

3. The gravamen of the offense of embezzlement under § 812.01, Florida Statutes 1941, F.S.A., is the conversion to one's own use of the property of another fraudulently and without the consent of

the owner or bailor, and the proof here fails to show that Apostle acted fraudulently.

4. The course of dealings between the Bank and Apostle whereby the latter deposited the proceeds from the sale of eggs to his general account, from which all items connected with the business were paid without objection from the Bank or without requiring that the proceeds from the sale of said eggs be kept in a special deposit or in a trust account, indicates an intent on the part of the Bank to construe the relationship between Apostle and it as merely one of debtor and creditor and estops the Bank from asserting that the failure to pay the indebtedness due by Apostle was a conversion amounting either to larceny or embezzlement.

5. Moreover, there is no showing of any compliance with Paragraph 6[1] of the bond to the effect that the obligee ever received any confirmation from any of the purchasers whereby such purchaser agreed to pay for any of the goods purchased for resale to them by the principal.

The judgment of the lower Court is Affirmed.

---

[1] "6. Any claim for loss shall be predicated upon submission of evidence that the Obligee received confirmation from one of the purchasers named here- in agreeing to pay for any goods, ware, or merchandise purchased for re-sale to them by the Principal."